UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 05-294 (EGS) |
| | : | |
| TY EDWARDO CLARK, | : | |
| | : | Motions Hearing |
| Defendant. | : | January 10, 2006 |
| | : | |

**GOVERNMENT'S OMNIBUS OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE,
MOTION TO SUPPRESS STATEMENTS AND MOTION TO SEVER COUNTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes Defendant's motions to suppress tangible evidence and statements and to sever counts. As grounds for this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a motions hearing.

**FACTUAL BACKGROUND**

Defendant Ty Edwardo Clark is currently charged with one count of Unlawful Possession of a Firearm by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year, two counts of Unlawful Possession with Intent to Distribute Cannabis, one count of Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense, and one count of Unlawful Possession with Intent to Distribute Cocaine Base. These charges arose out of Defendant's criminal conduct on July 6, 2005 and July 15, 2005.

On July 6, 2005, at approximately 9:00 p.m., members of Metropolitan Police Department's Sixth District Focus Mission Team pulled into a parking lot in the 300 block of Ridge Road, S.E., in the District of Columbia, a high-crime area where drug and gun offenses were common. As the

officers entered the lot, they observed Defendant standing a few feet away from the driver's side of a red van bearing D.C. tag number BY7075, talking to an unidentified Hispanic male. Several other men who were standing some ten to fifteen feet away fled when the officers, wearing highly visible police insignia, approached. Most of the officers pursued these men, leaving Officers Peter Shaw and Scott Siegel in the parking lot. Neither officer drew a weapon, or even had his hand on his gun, but Officer Shaw said to Defendant and his companion, "Let me see your hands." Instead of complying with Officer Shaw's request, Defendant reached for the right side of his waistband area in a manner consistent with a person carrying a weapon. Officer Shaw repeated his command. Again, Defendant reached for his waistband. Officer Shaw then ordered Defendant to get on his knees and put his hands behind his head. Defendant responded that he could not because he had just had an operation. Officer Shaw instructed Defendant to put his hands on the van. Defendant did so.

Officer Shaw then patted the right side of Defendant's waistband felt what he immediately recognized to be the grip of a handgun. While Officer Shaw was reaching for Defendant's left hand to cuff him, Defendant spontaneously said, "I got a gun on me. I don't have one in the chamber. I got robbed yesterday, that's why I carry it." Officer Shaw lifted Defendant's shirt and saw a grey handgun in Defendant's waistband. The handgun was determined to be a nine-millimeter Ruger, model P89, serial number 31296940. The magazine was loaded with nine rounds of ammunition. Defendant was arrested. During a search incident to arrest, officers found approximately $350 in cash and the key and registration to the van on Defendant's person. A subsequent search of the van revealed, inside the driver's side roof lining, a clear ziplock bag containing loose green weed substance that subsequently field tested positive for THC, the active ingredient in marijuana. From behind the rear seats of the van, the officers recovered a brown paper bag containing multiple empty

ziplocks, an electronic scale, and a razor blade. Defendant was transported to the Fifth District police station for processing.

In response to routine booking questions, Defendant stated that he resided at 1204 Holbrook Street, N.E., Apartment No. 2, in the District of Columbia. On July 8, 2005, Detective Lavinia Quigley applied for a D.C. Superior Court search warrant for 1204 Holbrook Street, N.E., Apartment No. 2, to search for evidence of illegal firearms and ammunition possession. Superior Court Judge Ronald P. Wertheim signed the search warrant the same day. On July 15, 2005, at approximately 8:12 a.m., members of the Metropolitan Police Department's Major Narcotics Branch executed the warrant. Upon entering the apartment, an officer observed Defendant near an area where the police subsequently recovered 21.2 grams of cocaine base. Also recovered during the search of the apartment were 112.2 grams of marijuana, $1834 in U.S. currency, a .22 caliber rifle and ammunition, a BB gun, and personal papers which indicated that Ty Edwardo Clark was a resident of the premises. Defendant again was arrested and transported to the Fifth District for processing.

**ARGUMENT**

I. **The Tangible Evidence Properly Was Seized on July 8, 2005 and July 15, 2005.**

Defendant now moves to suppress the tangible evidence recovered from his van on July 8, 2005, and from his apartment on July 15, 2005, on the ground that that evidence was obtained in violation of the Fourth Amendment to the United States Constitution. This argument is meritless.

   A. **The officers had reasonable articulable suspicion to stop and frisk Defendant on July 6, 2005.**

The recovery of the loaded handgun from Defendant's waistband, the money from his pocket, and the drugs and related paraphernalia from his van did not violate his Fourth Amendment rights.

First, Defendant was not seized within the meaning of the Fourth Amendment until after he reached for his waistband, which gave rise to reasonable articulable suspicion that he was armed and therefore justified an investigatory frisk. A police officer's order to a suspect to show his hands, without more, is not a seizure for Fourth Amendment purposes. *United States v. Broomfield*, 417 F.3d 654, 655-57 (7th Cir. 2005) (finding no seizure where officer told man who fit general description of robber to stop and to take his hands out of his pockets); *Brown v. City of Oneota, New York*, 221 F.3d 329, 341 (2d Cir. 2000) (holding that man approached by two police officers who asked him to show his hands was not seized). *But cf. United States v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003) (holding that seizure occurred where marshals who "likely had their hands on their weapons" ordered man lying in bed to show his hands); *Brown*, 221 F.3d at 340 (finding seizure where officer pointed spotlight at suspect, ordered him to "come here," and told him to show his hands).

Even if Officer Shaw's order to Defendant to show his hands ordinarily would have constituted a seizure, it did not in this case, because Defendant did not comply. In *United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000), police officers pulled into a parking lot in Southeast Washington that they characterized as "a high narcotics area" and saw a car occupied by two individuals: Robert Lee Johnson in the front passenger seat and another person in the driver's seat. *Id.* at 1314. The officers also saw a woman lean into the passenger's window and hand Johnson an unidentified object. *Id.* at 1314-15. As they approached, the woman began to walk away, at which point Johnson made a "shoving down" motion. One of the officers drew his gun, told his partner to do the same, and shouted, "Let me see your hands." Johnson did not comply but made "a couple of more shoving motions down" before finally raising his hands. *Id.* at 1315. A patdown revealed

-4-

drugs on Johnson's person. *Id.* In rejecting Johnson's Fourth Amendment challenge, the D.C. Circuit stated:

> [W]e do not think the seizure took place immediately after Johnson's first "shoving down" motion, when [the officer] drew his gun and ordered Johnson to raise his hands. Under *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), a seizure requires the application of physical force or submission to an assertion of authority. Before Johnson raised his hands, [the officer] had made a show of authority but Johnson had not submitted to it. On the contrary, he continued to make "shoving down" motions, gestures that were the very opposite of complying with [the officer's] order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun.

*Id.* at 1316-17. Similarly, in this case, Officer Shaw's order to Defendant to show his hands was not a seizure, because Defendant did not submit to the officer's show of authority. Rather, Defendant was not seized until he actually placed his hands on the van.

Under the circumstances of this case, that seizure, and the subsequent frisk, were fully justified. A police officer who has a reasonable articulable suspicion that "criminal activity may be afoot" may seize a person briefly for investigative purposes. *Terry v. Ohio*, 392 U.S. 1, 20, 30 (1968). The officer need not be certain that the suspect is involved in criminal activity. The Fourth Amendment requires only "some *minimal* level of objective justification" for making a *Terry* stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (emphasis added). Reasonable articulable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . . ." *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000). Thus, a *Terry* stop may be conducted simply "on the need to 'check out' a reasonable suspicion." *United States v. Clark*, 24 F.3d 299, 303 (D.C. Cir. 1994).

In determining whether reasonable articulable suspicion exists, the Court should consider the sum of the circumstances rather than viewing each specific act in isolation. *Sokolow*, 490 U.S. 1,

8-9 (1989). "An officer on the beat does not encounter discrete, hermetically sealed facts," and for that reason, although "a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors – especially when viewed through the eyes of an experienced officer – may." *United States v. Edmonds*, 240 F.3d 55, 59-60 (D.C. Cir. 2001). This is true even when each individual factor is ambiguous or even completely consistent with innocent conduct. *Sokolow*, 490 U.S. at 9. The total evidentiary picture "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see also Sokolow*, 490 U.S. at 8-10 (holding that although each factor contributing to reasonable suspicion in the case was consistent with innocence, "taken together they amount to reasonable suspicion"). Therefore, even if the conduct justifying the stop is "ambiguous and susceptible of an innocent explanation," an officer is entitled to detain the individuals involved to resolve the ambiguity. *Wardlow*, 528 U.S. at 125 (citations omitted).

Moreover, where the officer "has reason to believe that he is dealing with an armed and dangerous individual," he may conduct "a reasonable search for weapons" for his own protection. *Terry*, 392 U.S. at 27; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) (noting that purpose of *Terry* frisk is "to allow the officer to pursue his investigation without fear of violence"). In *Michigan v. Long*, the Supreme Court noted:

> We stress that a *Terry* investigation . . . involves a police investigation 'at close range,' when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger . . . . In such circumstances, we have not required that officers adopt alternative means to ensure

> their safety in order to avoid the intrusion involved in a *Terry* encounter.

463 U.S. 1032, 1052 (1983).

In this case, Officer Shaw had ample reasonable articulable suspicion to justify a *Terry* frisk of Defendant. The officer observed Defendant with another man in a parking lot at 9 p.m. in an area known for drug trafficking and associated violent crimes. Upon their approach, several other men in the parking lot fled, and Defendant refused to comply with Officer Shaw's order to show his hands. Instead, he reached twice for his waistband. As in *Johnson*, these "continued furtive gestures in response to being confronted by a police officer" were "suspicious enough to support a reasonable belief that [Defendant] may have been engaged in criminal activity." *Johnson*, 212 F.3d at 1317; *see also United States v. Williams*, 822 F.2d 1174, 1179-80 (D.C. Cir. 1987) (stating that furtive gestures may suggest that suspect is armed and give rise to reasonable articulable suspicion to conduct a *Terry* frisk for weapons), *superseded by rule on other grounds as stated in United States v. Caballero*, 936 F.2d 1292, 1289-99 (D.C. Cir. 1991). That is so even though no weapon, or even a clothing bulge suggestive of a weapon, was visible to the officers. *Johnson*, 212 F.3d at 1317 ("A frisk may after all be conducted even when a suspect's clothing exhibits no visible bulges.").

Moreover, the characteristics of the neighborhood in which Defendant was stopped could contribute to reasonable articulable suspicion. As the Supreme Court recognized in *Wardlow*, 528 U.S. at 124: "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis" (citation omitted). Likewise, the D.C.

Circuit has described the high-crime nature of a neighborhood as "among the relevant contextual considerations in a *Terry* analysis." *Johnson*, 212 F.3d at 1316 (quoting *Wardlow*) (internal quotation marks omitted). In this case, Defendant was stopped in an area with a high incidence of gun and drug offenses, precisely the sort of infraction of which Defendant was suspected. *Cf. Edmonds*, 240 F.3d at 60 (noting that characteristics of neighborhood were particularly significant where government establishes not merely that location of activity giving rise to *Terry* stop "suffers from general, undifferentiated 'crime,' but that it is home to the precise type of infractions" that police believe suspect may have committed). In light of all these factors, the *Terry* stop and frisk was justified.

      **B.**    **The search of Defendant's van was a valid search incident to a lawful arrest.**

The search of Defendant's van was a valid search incident to arrest. After Officer Shaw found a pistol in Defendant's waistband, Defendant lawfully was arrested, and properly could be searched incident to that arrest. *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("[W]e hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."); *Chimel v. California*, 395 U.S. 752, 763 (1969) (stating that when police make lawful arrest, there is "ample justification . . . for a search of the arrestee's person" and area within his immediate control). A search incident to arrest is a well-recognized exception to the Fourth Amendment's warrant requirement. *United States v. Wesley*, 293 F.3d 541, 545 (D.C. Cir. 2002).

In this case, the search incident to arrest properly extended to Defendant's van. In *New York v. Belton*, 453 U.S. 454, 460 (1981), the Supreme Court held that whenever "a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident

of that arrest, search the passenger compartment of that automobile" (footnotes omitted). The officers also may examine the contents of any container found within the passenger compartment. *Id.* at 460-461. In *Thornton v. United States*, 124 S. Ct. 2127, 2131 (2004), the Supreme Court extended the *Belton* rule to a defendant who was outside his car when he was arrested:

> In all relevant respects, the arrest of a suspect who is next to a vehicle presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle. An officer may search a suspect's vehicle under *Belton* only if the suspect is arrested. A custodial arrest is fluid and "[t]he danger to the police officer flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty." The stress is no less merely because the arrestee exited his car before the officer initiated contact, nor is an arrestee less likely to attempt to lunge for a weapon or to destroy evidence if he is outside of, but still in control of, the vehicle. In either case, the officer faces a highly volatile situation. It would make little sense to apply two different rules to what is, at bottom, the same situation.

(citations and emphasis omitted).

To be sure, the defendant in *Thornton* had been seen inside his vehicle shortly before his arrest, whereas in this case, the officers never saw Defendant in the van. But that is a distinction without a difference. First, the *Thornton* Court noted that "an arrestee's status as a 'recent occupant' may turn on his temporal *or* spatial relationship to the car at the time of the arrest and search." *Id.* (emphasis added); *see also United States v. Osife*, 398 F.3d 1143, 1148 n.4 (9th Cir.) (same), *cert. denied*, 126 S. Ct. 417 (2005). Defendant was only a few feet away from the driver's side of his van, with the keys and registration to the vehicle on his person. *Cf. United States v. Poggemiller*, 375 F.3d 686, 687-88 (8th Cir. 2004) (upholding search of an arrestee's car when an officer had observed the car leaving the arrestee's residence, but did not see the arrestee actually driving the car, and next saw the car some time later, stopped on the road with the arrestee standing ten feet away from it), *cert. denied*, 125 S. Ct. 1614 (2005); *United States v. Sholola*, 124 F.3d 803, 817 (7th Cir. 1997)

(holding that defendant who was not seen inside car, but who opened car door with his own keys and stated, "See, it's my car," was "positively linked to [the car] prior to his arrest" so as to justify search of car incident to his arrest) (internal quotation marks omitted).  His relationship to the van was sufficient to justify a search of the vehicle.

Second, the same justifications for permitting searches incident to arrest militate in favor of allowing a search of a vehicle next to which an arrestee is standing, even if the arrestee was not seen inside the car immediately before the arrest.  In *Chimel*, a case where the arrestee was arrested in his home, the Supreme Court described the scope of a search incident to arrest as the person of the arrestee and the area immediately surrounding him. 453 U.S. at 457.  "This rule was justified by the need to remove any weapon the arrestee might seek to use to resist arrest or to escape, and the need to prevent the concealment or destruction of evidence." *Thornton*, 123 S. Ct. at 2130 (citing *Chimel*, 453 U.S. at 457).  Like an arrestee arrested while inside a car, an arrestee arrested while standing next to a car might lunge for a weapon in the car, or try to destroy evidence secreted there, even if some time has passed since he exited the vehicle.

This is not to say that officers automatically may search *any* car near an arrestee, but that where, as here, the arrestee has on his person the car keys and registration clearly linking him to the vehicle, a search of the vehicle incident to arrest is reasonable.  Indeed, in *United States v. Fafowora*, 865 F.2d 360, 362 (D.C. Cir. 1989), a pre-*Thornton* case, the D.C. Circuit applied a similar analysis.  The Court held that "when the police come upon the arrestees outside of the automobile . . . the normal framework of *Chimel* applies," and the area searched must be "within the immediate surrounding area into which [the arrestees] might have reached at the time the [police] caught up with them." *Id.* (internal quotation marks omitted).  The Court then found the car in *Fafowora* to

be outside the immediate surrounding area of the arrestees, who were arrested a car length away, walking in the opposite direction. *Id.* at 361-62. In contrast, Defendant in this case was standing just a few feet away from his van, carrying his keys. A search of the van incident to Defendant's arrest was justified under these circumstances.

    **C.    The search warrant affidavit established probable cause, and the information contained therein was not stale when the warrant was executed on July 15, 2005.**

Defendant argues that the warrant failed to establish probable cause to search his residence searched and that the information contained in the affidavit in support of the search warrant was stale by the time the warrant was executed on July 15, 2005. This assertion is meritless.

The police officers who executed the search warrant at Defendant's apartment on July 15, 2005, were entitled to rely in good faith on the warrant issued by the Superior Court judge. *United States v. Richardson*, 861 F.2d 291, 294 (D.C. Cir. 1988). In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court distinguished between the function of the magistrate (whose role is to evaluate the legal sufficiency of a warrant), and the police officer (whose role is to investigate the crime and to execute the warrant), noting:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause, and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.

*Id.* at 921 (internal quotations omitted). Suppression in such a case is appropriate only if "the magistrate abandoned his detached and neutral role" in assessing the affidavit or if "the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 923. In the instant case, there are no

allegations by the defense that the Superior Court judge who signed the warrant abandoned his detached neutral role.

Nor is there any evidence that the officers were dishonest or reckless in preparing their affidavit or could not have harbored a reasonable belief in the existence of probable cause. Suppression is not appropriate if the officers conducting the search acted in "objectively reasonable reliance" on the warrant's validity, and ordinarily, the existence of a warrant is sufficient to establish that the officers acted in good faith in conducting the search. *Id.* at 922; *United States v. Salamanca*, 990 F.2d 629, 634 (D.C. Cir. 1993) (stating that "even if [warrant] affidavit did not sufficiently establish a finding of probable cause, the executing officers justifiably relied in good faith on the magistrate's determination that probable cause existed"); *United States v. Maxwell*, 920 F.2d 1028, 1034 (D.C. Cir. 1990) (same); *United States v. Thornton*, 746 F.2d 39, 51 (D.C. Cir. 1984) (same). This is true even where the affidavit in support of the search warrant is later found to be deficient. *United States v. McLaughlin*, 851 F.2d 283, 284-85 (9th Cir. 1988) (ruling that *Leon* applied despite allegations of staleness and fact that affidavit failed to set forth sufficient nexus to premises). In this case, however, the affidavit in support of the warrant was sworn to by an experienced detective and set forth in detail the circumstances of Defendant's arrest on July 6, 2005, and the fact that gun possessors, particularly gun possessors in the drug trade, commonly keep additional firearms and ammunition in their homes, along with documentary evidence of their gun ownership. It was reasonable for the executing officers to rely on the search warrant.

Defendant also argues that the passage of some nine days between his firearm and narcotics possession to the execution of the search warrant rendered the information in the affidavit "stale." Defendant is wrong. In *Andresen v. Maryland*, 427 U.S. 463 (1976), a search warrant was issued

some three months after the defendant's fraudulent activity for the seizure of office records that had been prepared in the ordinary course of the defendant's law and real estate business. On appeal, the defendant argued that the evidence in support of the search warrant was stale and that, as a result, the search was not supported by probable cause. In rejecting the defendant's argument, the Supreme Court held that it was "eminently reasonable" to expect that the defendant's business records would be maintained in the offices searched for an extended period of time. *Id.* at 478 n.9. As the lower court's opinion in *Andresen* noted:

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock. The character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has seen it; the observation of the burial of a corpse in the cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed.

*Andresen v. State*, 331 A.2d 78, 106 (Md. App. 1975), *aff'd*, 427 U.S. 463 (1976). In other words, a court confronting a staleness claim should not simply "count[] the number of days between the time of the facts relied upon and the search warrant's issuance." *United States v. Rahn*, 511 F.2d 290, 292 (10th Cir. 1975). Rather, the court should look to whether it is reasonable to believe that, given the passage of time, the evidence sough is still in the location suggested by the information in the affidavit.

It is well established that weapons and documents concerning the ownership of those weapons are likely to be retained by their owner in his or her dwelling for long periods of time. *E.g.*, *United States v. McCall*, 740 F.2d 1331, 1337 (4th Cir. 1984) (ruling that probable cause existed to

justify search warrant for stolen revolver some twenty months after offense); *Rahn*, 511 F.2d at 292 (holding that information supporting search of suspect's home not stale where suspect and co-conspirator agreed some two years before to steal weapons from government vault and where suspect remarked at the time that the weapons would be worth money if kept for several years); *see also United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) ("[P]eople who own pistols generally keep them at home or on their persons."). Similarly, in this case, the place to be searched was Defendant's established dwelling, and the evidence sought – firearms, ammunition, and ownership papers for such items – was likely to be retained there for long periods of time. Accordingly, the information in the search warrant affidavit was not stale, and the evidence recovered from Defendant's home should not be suppressed.

**II.     Defendant's Statements Were Spontaneous and Voluntary.**

Defendant argues that his statement – "I got a gun on me. I don't have one in the chamber. I got robbed yesterday, that's why I carry it." – should be suppressed because it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and involuntary. This claim is meritless. First, *Miranda* applies only when a suspect in "custody," *Beckwith v. United States*, 425 U.S. 341 (1976), that is, when he is "subjected to restraints comparable to those associated with a formal arrest," *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984). A *Terry* stop generally is not "custody" within the meaning of *Miranda*. *Id.* at 441. "Fidelity to the [*Miranda* doctrine] . . . requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the [*Miranda*] decision are implicated. . . . [Q]uestioning incident to an ordinary traffic stop is quite different from station house interrogation." *Id.* at 437-38. It is immaterial whether the suspect believes himself to be in custody; rather, "the only relevant inquiry is how a reasonable [person] in

the suspect's position would have understood his situation." *Id.* at 442. Because Defendant was not in custody when he made his statement, but was merely the subject of a *Terry* stop and frisk, he was not entitled to *Miranda* warnings.

Second, *Miranda* does not apply to statements made in the absence of police interrogation. *Miranda*, 384 U.S. at 478; *see also Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Defendant's remark about the gun was spontaneous. Neither Officer Shaw nor any other officer asked him any questions before he made that statement. Therefore, the statement is admissible even though Defendant had not been warned of his *Miranda* rights before he made it.

Third, Defendant's statement plainly was voluntary. The test for voluntariness is whether, under the totality of the circumstances, "coercive police activity" has "overborne" a suspect's "will." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "[P]olice overreaching" is a "crucial element" of an involuntary statement, for "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly*, 479 U.S. at 163-64. In this case, there is no evidence whatsoever that the police did anything to coerce Defendant into making the remark about the gun; indeed, they did not even ask him a question. Defendant's claim that his statement was involuntary is specious.

### III.     The Charges Against Defendant Are Properly Joined.

As a result of his arrest on July 6, 2005, Defendant was charged with one count of Unlawful Possession of a Firearm by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year, one count of Unlawful Possession with Intent to Distribute Cannabis, and one count of Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense. After the execution of the search warrant at his residence on July 15, 2005, Defendant was charged with one

count of Unlawful Possession with Intent to Distribute Cocaine Base and one count of Unlawful Possession with Intent to Distribute Cannabis. Pursuant to Federal Rules of Criminal Procedure 8(a) and 14, Defendant now seeks to sever the charges stemming from the July 6, 2005, incident from those charges stemming from the July 15, 2005, search. This claim lacks merit.

### A.    All five counts are properly joined under Rule 8.

Federal Rule of Criminal Procedure 8(a) governs the joinder of multiple charges against one defendant. Rule 8(a) permits multiple offenses to be "charged in the same indictment" if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Courts employ "a liberal reading of Rule 8." *United States v. Jackson*, 562 F.2d 789, 797 (D.C. Cir. 1977); *see also United States v. Perry*, 731 F.2d 985, 991 (D.C. Cir. 1984) (noting "broad policy favoring initial joinder"). Indeed, in *Jackson*, the D.C. Circuit stated, "As long as only one defendant is concerned, Rule 8(a) permits joinder of such offenses, even if they are entirely unrelated to each other." 562 F.2d at 796. But in this case, the offenses arising out of the July 6 incident and the offenses arising out of July 15 incident clearly *are* of "the same or similar character" *and* constituted "parts of a common scheme or plan." Defendant possessed a firearm and marijuana on both dates. On each day, he was engaged in an ongoing drug trafficking enterprise, and possessed guns to assist him in that endeavor. Indeed, the events of July 15 arose out of Defendant's firearms and narcotics possession on July 6, as the search warrant for Defendant's residence was based on the circumstances of Defendant's earlier arrest and was part of a continuing investigation into the conduct leading to that arrest.

The fact that the two incidents were separated by nine days is immaterial. The D.C. Circuit historically has been less concerned with the passage of time than the identity of the parties involved and the similarity of their actions. For example, in *United States v. Burkley*, 591 F.2d 903, 919 (D.C. Cir. 1978), that Court held that two sales of heroin by the same defendant to the same undercover officer, the first in Washington, D.C., and the second six weeks later in Phoenix, Arizona, constituted a common scheme or plan. Likewise, in *Hill v. United States*, 418 F.2d 449, 450 (D.C. Cir. 1968), the Court upheld the joinder of two robberies of the same store owner by the defendant one and half months apart: "The offenses charged were of the same character; the robberies were close in time, and victimized the same store." Similarly, Defendant twice possessed marijuana with the intent to distribute it in the same general community. The charges arising out of those two instances properly are joined under Rule 8.

### B. Joinder works no prejudice to Defendant under Rule 14.

Defendant also asserts that this Court should exercise its discretion under Federal Rule of Criminal Procedure 14 to grant severance, order an election or separate trials of counts, or provide whatever other relief justice requires. Rule 14 authorizes the Court to sever properly joined charges if joinder will prejudice the defendant. But it is well established that courts faced with a severance motion under Rule 14 should strike a balance in favor of joint trials. *E.g.*, *United States v. Manner*, 887 F.2d 317, 324 (D.C. Cir. 1989); *United States v. Bruner*, 657 F.2d 1278, 1289-90 (D.C. Cir. 1981). Indeed, Rule 14 tolerates some prejudice to a defendant in a joint trial, as severance is not required merely because a defendant might have a better chance of acquittal if he, or a count in the indictment, were tried separately. *Manner*, 887 F.2d at 324; *see also United States v. Wright*, 783

F.2d 1091, 1095 (D.C. Cir. 1986); *United States v. Hopkins*, 464 F.2d 816, 819 (D.C. Cir. 1972); *United States v. Wilson*, 434 F.2d 494, 501 (D.C. Cir. 1970).

In considering Rule 14 motions, courts seek to balance "the economy of a single trial" against possible prejudice to the defendant. *Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964). Although there is a strong federal interest in joinder, *United States v. Long*, 905 F.2d 1572, 1582 (D.C. Cir. 1990), courts have been keenly aware of the prejudice a defendant might suffer when facing multiple charges. In *Drew*, the Court recognized that the joinder of charges may (1) prevent the defendant from presenting separate defenses, (2) force the defendant to run the risk that a jury will infer a criminal disposition, (3) create the danger that a jury will aggregate the evidence against the accused, and (4) generate in the jury "a latent feeling of hostility" towards the defendant. *Drew*, 331 F.2d at 88. The *Drew* Court analogized the situation of a defendant facing multiple charges to that of a defendant against whom evidence of other crimes is admitted, and held that joinder of separate offenses is permissible if (1) the evidence would be admissible in separate trials or (2) "the evidence of each crime is simple and distinct." *Id.* at 90-91. Building on the foundation laid by *Drew*, the *Burkley* Court ruled that a trial court considering a joinder issue "should initially be guided by whether evidence of each crime could be admitted in a separate trial of the other(s) under Federal Rules of Evidence 403 and 404(b). If the answer is affirmative and there appears no other cause of prejudice to either side from consolidation, the consolidation may go forward." 591 F.2d 903, 919.

In this case, if the Court ordered separate trials on the first three counts of the indictment, the government properly could seek to introduce evidence of the other two counts under Rule 404(b), and vice versa. Such evidence would tend to establish Defendant's knowledge, intent, lack of accident or mistake, and common scheme or plan. The evidence from either incident would be

admissible under Rule 404(b) in separate trials, and, as such, Defendant will face no greater prejudice in the present consolidated action. *United States v. Brown*, 16 F.3d 423, 434 (D.C. Cir. 1994) (finding no prejudicial joinder under Rule 14 where defendant was tried for possessing guns and drugs found during a search warrant in November and with possessing a gun recovered when he was arrested the next February, because subsequent gun possession would have been admissible in trial of earlier charges to show knowledge, intent, and lack of mistake). Besides, if the July 6 and July 15 events are as distinct as Defendant suggests in his motion, there is little reason to grant severance, as these differences will make it less likely that a jury will aggregate the evidence presented. Therefore, under either prong of the *Drew* test, Defendant's motion for severance should be denied.

## CONCLUSION

WHEREFORE, the United States respectfully requests that Defendant's motions to suppress tangible evidence and statements and to sever counts be denied.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney

_____
JESSIE K. LIU
Assistant United States Attorney
D.C. Bar No. 472845
555 Fourth Street, N.W., Room 4649
Washington, D.C. 20530
(202) 514-7549