## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Crim. No. 05-294 (EGS)** |
| **v.** | : | |
| | : | |
| **TY EDWARDO CLARK,** | : | **Sentencing** |
| | : | **March 7, 2006** |
| **Defendant.** | : | |

### GOVERNMENT'S RESPONSE TO
### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING
### REGARDING APPLICATION OF POWDER VS. CRACK COCAINE GUIDELINES

The United States, by and through its attorney, the United States Attorney for the District of

Columbia, respectfully submits the following response to Defendant Ty Edwardo Clark's

Memorandum in Aid of Sentencing Regarding Application of Powder vs. Crack Cocaine Guidelines

("Mem."). In support of its response, the United States relies on the following points and authorities

and such points and authorities as may be cited at a hearing on the matter.

### FACTUAL BACKGROUND

On July 6, 2005, at approximately 9:00 a.m., members of the Metropolitan Police

Department's Sixth District Focus Mission Team pulled into a parking lot in the 300 block of Ridge

Road, S.E., in the District of Columbia. As the officers entered the lot, they observed Defendant

Clark standing a few feet away from the driver's side of a red van, talking to an unidentified man.

Several other men who were standing in the parking lot fled when the officers approached. Two of

the officers then frisked Defendant Clark and found a nine-millimeter Ruger handgun, model P89,

serial number 31296940, loaded with nine rounds of nine-millimeter ammunition, in his waistband.

Neither the handgun nor the ammunition had been manufactured in the District of Columbia. At the

time that he possessed the handgun and ammunition, Defendant Clark had been convicted of an

offense punishable by imprisonment for a term exceeding one year, in Case No. F-4082-90 in the District of Columbia Superior Court.

After his arrest on July 6, 2005, Defendant Clark stated that he resided at 1204 Holbrook Street, N.E., Apartment No. 2, in the District of Columbia.  On July 8, 2005, officers of the Metropolitan Police Department obtained a search warrant for 1204 Holbrook Street, N.E., Apartment No. 2, to search for evidence of illegal possession of firearms and ammunition.  On July 15, 2005, at approximately 8:12 a.m., members of the Metropolitan Police Department's Major Narcotics Branch executed the warrant.  Upon entering the apartment, an officer observed Defendant Clark in the living room, which he was using as his bedroom, standing at the end of a couch with a fold-out bed.  A quantity of suspected cocaine base, some of it packaged in small yellow ziplocks, was on the bed.  The suspected cocaine base was analyzed by the Drug Enforcement Administration and found to contain a total of 21.2 grams of cocaine base, otherwise known as crack.  The officers also found a total of 112.4 grams of marijuana in Defendant Clark's apartment.

## PROCEDURAL HISTORY

On December 12, 2005, Defendant Clark pleaded guilty, pursuant to a plea agreement, to Counts 1 and 4 of a pending indictment, which charged him with Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment in Excess of One Year, in violation of 18 U.S.C. § 922(g), and Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  As part of his plea, Defendant Clark acknowledged that he was responsible for 21.2 grams of cocaine base, also known as crack, and 112.4 grams of marijuana.  Plea Agreement ¶ 2.  Defendant Clark also reserved the right to "seek a decrease in his offense level on the ground that the cocaine base, also known as crack, for which he is responsible should be treated

as though it were cocaine for the purpose of the Sentencing Guidelines." *Id.* ¶ 10. Defendant Clark subsequently filed a memorandum in aid of sentencing arguing that, in light of *United States v. Booker*, 125 S. Ct. 738 (2005), the Court should sentence him as though he were responsible for 21.2 grams of powder, rather than crack, cocaine, because the disparity in the Guidelines between crack and powder cocaine is unwarranted and unconstitutional.

## ARGUMENT

### I.    General Sentencing Considerations After *Booker*

On January 12, 2005, the United States Supreme Court held, in *United States v. Booker*, 125 S. Ct. 738 (2005), that certain applications of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") violated the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004) (holding that a mandatory state sentencing scheme under which a sentence is increased based on factual findings by a judge violates the right to a trial by jury). As a remedy, the Court invalidated the statutory provision that made the federal Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus making the Guidelines "effectively advisory." *Booker*, 125 S. Ct. at 746. But although the Guidelines are no longer mandatory, a district court must still "consult [the] Guidelines and take them into account when sentencing." *Id.* at 767 (citing 18 U.S.C. § 3553(a)(4) & (5)). "Under this new sentencing regime, a sentencing court is required 'to consider Guidelines ranges' applicable to the defendant, but is permitted 'to tailor the sentence in light of other statutory concerns as well.'" *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005) (quoting *Booker*, 125 S. Ct. at 757). Those other statutory concerns are expressed primarily at 18 U.S.C. § 3553(a). *Booker*, 125 S. Ct. at 757.

"A judge cannot satisfy [the duty to take the Guidelines into account] by a general reference to the entirety of the Guidelines Manual, followed by a decision to impose a 'non-Guidelines' sentence" (that is, a sentence that is neither within the traditionally calculated Guidelines range nor imposed pursuant to departures authorized by the Guidelines or related policy statements). *United States v. Crosby*, 397 F.3d 103, 111 (2d Cir. 2005). Thus, to comply with *Booker*, a sentencing court first should determine the applicable Guidelines sentence in the same manner as before *Booker*, including any departures that would be permissible under the Guidelines, and then, after considering the Guidelines and all other factors in Section 3553(a), decide whether to impose the Guidelines sentence or to impose a non-Guidelines sentence. *Id.* at 111, 113. If the court decides not to impose the Guidelines sentence, it should explain on the record its rationale for varying from the advisory sentence. *Id.* at 116; *see also United States v. Mares*, 402 F.3d 511, 519 (5th Cir.), *cert. denied*, 126 S. Ct. 43 (2005).[1] The final sentence then will be subject to review by the Court of Appeals for "reasonableness." *Booker*, 125 S. Ct. at 765-66.

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the Guidelines range as determined by the Court, or be justified as a Guidelines-sanctioned departure from that range. In effect, the Guidelines should become the primary benchmark for reasonableness post-*Booker*. Unless sentencing courts adhere to such a benchmark, federal sentencing practices are in danger of reverting to the largely unfettered system that, before enactment of the federal Sentencing Reform Act ("SRA") in 1984, had led to widespread

---

[1] Although a sentencing court is no longer required to impose a sentence within the range of sentences articulated by the Guidelines, the Supreme Court did not change the statutory provisions that require a district court to "state in open court the reasons for its imposition of the particular sentence," 18 U.S.C. § 3553(c), or to state in writing its reasons for imposing a sentence different from one within the calculated Guidelines range. *See* 18 U.S.C. § 3553(c)(2).

disparity and uncertainty in punishment among defendants with similar criminal histories who were convicted of similar crimes. *See Crosby*, 397 F.3d at 113-14 ("[I]t would be a mistake to think that, after *Booker*[], district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum.").

Congress passed the SRA in an effort to reduce such disparities. *See Mistretta v. United States*, 488 U.S. 361, 363-64 (1989). The SRA created the United States Sentencing Commission ("U.S.S.C." or "Commission") and authorized it to develop a system of mandatory sentencing guidelines which would minimize unwarranted sentencing disparities by establishing, consistent with statutory limits and legislative directives, the appropriate kind and severity of sentences for federal crimes. *See United States v. Williams*, 980 F.2d 1463, 1467 (D.C. Cir. 1992) ("The very purpose of the Guidelines . . . was to eliminate disparity in the sentences of similarly situated defendants."). Every Supreme Court justice in the various opinions in *Booker* recognized that the Guidelines carry out the express will of Congress that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. *See, e.g.*, *Booker*, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); *id.* at 759 (same) ("Congress' basic statutory goal — a system that diminishes sentencing disparity — depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction.") (emphasis in original); *id.* at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); *id.* at 789

(dissenting opinion of Scalia, J.) (stating that "the primary objective of the Act was to reduce sentencing disparity"). Although *Booker* holds that uniformity cannot be achieved through mandatory Guidelines, that goal nonetheless still should weigh heavily in the determination of a reasonable sentence, because reducing unjustified disparities was the underlying purpose of federal sentencing reform.

Fidelity to the Guidelines best accomplishes that goal of uniformity, as well as the other general sentencing goals set forth by Congress in 18 U.S.C. § 3553(a), and, therefore, the Guidelines are entitled to substantial deference. *See United States v. Wilson*, 350 F. Supp. 2d 910, 914 (D. Utah 2005) ("*Wilson I*"); *accord United States v. Peach*, 356 F. Supp. 2d 1018, 1021 (D.N.D. 2005) (stating that "district courts should give the Sentencing Guidelines 'substantial weight'"); *United States v. Wanning*, 354 F. Supp. 2d 1056, 1062 (D. Neb. 2005) ("[T]he Guidelines must be given substantial weight even though they are now advisory [because] [t]o do otherwise is to thumb our judicial noses at Congress."). As Judge Cassell reasoned in *Wilson I*, the Guidelines deserve deference because they are the product of an expert commission that studied the sentencing process at great length in order to fashion recommended sentences that carry out Congress's specific sentencing directives and meet the general purposes of sentencing described by Congress in the SRA. The resulting Guidelines, *Wilson I* held, plainly reflect the public's will as expressed by democratically elected representatives, because Congress repeatedly has approved of the Guidelines or, in certain instances, specifically adjusted them to comply with Congressional policy decisions. Judge Cassell further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of those reasons, Judge Cassell determined that he would "give heavy weight to the Guidelines in determining an appropriate sentence," and "only depart from those

Case 1:05-cr-00294-EGS    Document 23    Filed 01/30/2006    Page 7 of 39

Guidelines in unusual cases for clearly identified and persuasive reasons." *Wilson*, 350 F. Supp. 2d at 925.[2]

*Booker* directs sentencing courts to fashion sentences that are consistent with the factors set forth in 18 U.S.C. § 3553(a), and that can best be done by adhering closely to the sentences derived from the Guidelines. It is the very purpose of the Guidelines to assist judges in meeting the sentencing goals of Section 3553(a).[3] Some courts have suggested that the Guidelines should not carry special weight because they do not sufficiently reflect the factors set out in Section 3553(a). *See, e.g.*, *United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005). That view is misguided. As Judge Cassell noted, "It would be startling to discover that while Congress had created an expert agency, approved the agency's members, directed the agency to promulgate Guidelines, allowed those Guidelines to go into effect, and adjusted those Guidelines over a period of fifteen years, that the resulting Guidelines did not well serve the underlying congressional purposes. The more likely conclusion is that the Guidelines reflect precisely what Congress believes is the punishment that will achieve its purposes in passing criminal statutes." *Wilson I*, 350 F. Supp. 2d at 915; *accord*

_____

   2/    The Sentencing Commission also believes, for the same reasons, that the Guidelines should be given substantial weight. *See Peach*, 356 F. Supp. 2d at 1020 (recounting February 2005 congressional testimony of the Honorable Ricardo H. Hinojosa, Chair of the United States Sentencing Commission).

   3/    Through the specific provisions covering offense and offender characteristics and the various grounds for departure, the Guidelines address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."

*Wanning*, 354 F. Supp. 2d at 1061. Indeed, Congress expressly reserved for itself the right to disapprove or amend any Guideline proposed by the Commission.[4/] Thus, the Court should presume that the Guidelines mirror, rather than conflict with, the goals of Section 3553(a). *See generally Wilson I*, 350 F. Supp. 2d at 914-22; *United States v. Wilson*, 355 F. Supp. 2d 1269 (D. Utah 2005) ("*Wilson II*") (critiquing reasoning of *Ranum* opinion).

Accordingly, a sentence within the Guidelines range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of setting fair sentences which are as uniform as possible. *See Mares*, 402 F.3d at 519 (stating that "it will be rare for a reviewing court to say that [a Guidelines sentence] is unreasonable"). In this case, no unusual individual circumstances exist which warrant an exception to the preference for a Guidelines sentence.

II.    **The Court Should Not Deviate from the Guidelines on the Basis of the Disparity in Crack vs. Powder Cocaine Sentences, as the Guidelines Ranges Pertaining to These Substances Are a Direct Reflection of Congressional Choices on This Issue.**

Following *Booker*, the Court is no longer required to impose a Guidelines sentence in all cases, and its sentencing decision will be reviewed for reasonableness. In the Government's view, the most reasonable sentence in this case would be a sentence within the range calculated under the Sentencing Guidelines for trafficking in crack cocaine after adjustments for specific offense characteristics and acceptance of responsibility. Defendant Clark seeks a much lower non-Guidelines sentence, as little as less than a quarter of the lowest Guidelines sentence. His primary

---

[4/]    The Commission must submit any amendments to the Guidelines to Congress for at least a 180-day review period. Sentencing Guideline amendments take effect no later than November 1 of the calendar year in which submitted, "except to the extent that . . . the amendment is otherwise modified or disapproved by Act of Congress." 28 U.S.C. § 994(p).

justification for such a dramatic sentence reduction is the disparity between penalties for crack cocaine offenses and powder cocaine offenses.  This Court should reject that rationale.

The crack/powder sentencing disparity is the direct result of Congress's decision to punish crack cocaine offenses more severely than powder cocaine (and other drug) offenses.  The Guidelines merely reflect that legislative choice, as they must, because the Commission's authority to set sentencing policy extends no farther than the limit of Congressional assent.  Thus, at bottom, the issue Defendant Clark raises is not whether, *in this particular case*, it would be reasonable under *Booker* for the Court to override the Commission's judgment about the most appropriate sentence, but whether, *in all crack cocaine cases*, it would be reasonable for the Court to override Congress's judgment about how severely crack cocaine offenses should be punished.  In particular, Defendant Clark urges the Court to ignore the Guidelines and instead impose a much lower sentence, as low as 15 months, based on various alternative recommendations of the United States Sentencing Commission that Congress never has adopted (and, in one instance, expressly has rejected).  This Court should not follow the current Guidelines, Defendant Clark maintains, because they punish crack cocaine offenses too severely, especially compared to sentences for offenses involving powder cocaine, and because those severe sentences are imposed primarily on African-Americans.

But although *Booker* gives district courts more freedom to disagree with the Commission's choices in individual cases, it does not grant courts the same freedom to adopt on a categorical basis sentencing preferences at odds with Congressional policy choices.  It would be patently unreasonable for this Court to vary from the recommended Guidelines sentence solely to redress the perceived disparity between crack and powder cocaine sentences.  Such a categorical variance would ignore Congress's explicit choices regarding the appropriate level and relative severity of penalties for crack cocaine offenses; lead to unwarranted disparities in sentences for defendants who are guilty of

-9-

dealing in similar quantities of crack cocaine; and conflict with both the Supreme Court's admonition to take the Guidelines into account in all cases and with traditional concepts of discretionary decisionmaking.

### A.    *Background of Cocaine Sentencing Policies*

Defendant Clark's primary argument is that this Court should disregard the recommended Guidelines sentence because it reflects an unjustifiably harsh and racially discriminatory sentencing policy. Over the past decade, there has been an increasingly vigorous debate — especially between the Sentencing Commission and Congress — over whether the strict sentences for crack cocaine offenses are justified. A review of the history of that debate reveals several key points. First, although Defendant Clark relies heavily on the findings of the Sentencing Commission to support the argument that crack cocaine penalties should be equalized, or at least brought closer in line, with powder cocaine penalties, the Commission always has acknowledged that there is empirical support for punishing crack offenses more severely than powder cocaine offenses; the Commission disagrees with Congress primarily over how severely crack offenses should be punished in the first place. Second, when the Commission promulgated proposed amendments to lower crack penalties so that they were equal to powder penalties, Congress promptly rejected that proposal, and made it clear that crack offenses should be punished more severely. Third, although the Commission since has offered other proposals to reduce the penalties for crack offenses to bring them closer to the penalties for powder cocaine offenses, Congress still has not concluded that such a change is necessary.[5/] Thus,

_____

5/    One of the reasons Congress has not revised the crack cocaine penalty system is that, even among members who believe that some reduction in the crack/powder differential is needed, there is disagreement about the best way to make that reduction. Congress is not alone. Each of the Commission's studies of the question has resulted in a different approach to reducing the differential. The fact that each of the bodies whose role is to formulate national sentencing policy finds it difficult to agree internally on how best to resolve this issue strongly suggests that federal courts, which are not policymaking bodies, should be reluctant to intercede.

even if the Court does not agree that Congress effectively has put its imprimatur on the Guidelines as a whole, Congress clearly and unambiguously has approved the current crack Guidelines as establishing the appropriate level of punishment for crack dealers.

1.     *The Anti-Drug Abuse Act of 1986*

While the Sentencing Commission was developing its first set of Guidelines, Congress enacted tougher measures to combat illegal drug use.  The Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986) (codified at 21 U.S.C. § 841(a)), established, among other provisions, substantial mandatory minimum prison sentences for persons convicted of trafficking in significant quantities of a variety of illegal drugs, including crack and powder cocaine.  The Act set two levels of mandatory punishment — a minimum of ten and five years' imprisonment — which in general were intended to apply to "major" and "serious" drug traffickers, respectively.  *See* United States Sentencing Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* 7 (May 2002) ("2002 U.S.S.C. Report").

Congress deliberately established severe mandatory minimum sentences for trafficking in relatively small amounts of crack cocaine based on the conclusion that crack was a particularly dangerous and increasingly accessible drug.[6]  *See* United States Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 118 (Feb. 1995) ("1995 U.S.S.C.

---

[6]     The statute itself refers to "cocaine base," not crack cocaine.  21 U.S.C. § 841(b)(1)(A)(iii), (b)(1)(B)(iii).  When it incorporated the statutory mandatory minimum sentences into the Guidelines, the Commission defined "cocaine base" for Guidelines purposes to mean only that form of cocaine base known as crack cocaine.  *See* U.S.S.G. § 2D1.1, cmt. background.  Our Court of Appeals recently concluded that the statutory term "cocaine base" means a specific kind of cocaine base, that which is "smokable," or, more specifically, the smokable kind called "crack." *United States v. Brisbane*, 367 F.3d 910 (D.C. Cir.), *cert. denied*, 543 U.S. 938 (2004).  For purposes of the sentencing proceedings in this case, the Government will treat "cocaine base" and "crack cocaine" as equivalent terms, and refer solely to crack, even when referencing the provisions of 21 U.S.C. § 841.

Report"). Congress believed that, compared to powder cocaine, crack cocaine was (1) more likely to induce addiction; (2) more often associated with other serious crimes; (3) more likely to lead to widespread use among particularly vulnerable members of society because crack was relatively easy to manufacture, less expensive, easier to use, and tended to be more potent; (4) had harsher physiological effects; and (5) was more likely to be used by young people. *Id.*

Although Congress considered various crack/powder drug quantity thresholds to reflect crack cocaine's greater dangers, it ultimately enacted thresholds that treated traffickers in a given quantity of crack cocaine as severely as traffickers in 100 times that amount of powder cocaine; that is, for sentencing purposes, 100 grams of cocaine powder is equal to one gram of crack cocaine. *See* 1995 U.S.S.C. Report, at 116-17, 120. This resulted in a mandatory minimum sentence of five years' imprisonment for trafficking in between five and 49 grams of cocaine base (or between 500 and 4999 grams of powder cocaine) and ten years' imprisonment for trafficking in fifty grams or more of cocaine base (or 5000 grams, *i.e.*, 5 kilograms, or more of powder cocaine).[7] Thus, Congress "in effect defined a 'major' drug trafficker as one who distributes 50 grams or more of crack." *United States v. Webb*, 134 F.3d 403, 407 (D.C. Cir. 1998).

2.    *The Guidelines' Incorporation of Statutory Crack/Powder Thresholds*

The Sentencing Reform Act expressly required the Sentencing Commission to "assure that the guidelines specify a sentence to a substantial term of imprisonment" for certain categories of

_____

[7]    Additionally, in 1988, Congress enacted a mandatory minimum of five years' imprisonment for simple possession of five grams or more of cocaine base. Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (1988) (codified at 21 U.S.C. § 844(a)). Among other rationales, that provision was intended to promote law enforcement efforts to curtail crack cocaine trafficking by creating a presumption that possession of five grams or more of crack showed that the possessor was a drug dealer. *See* 1995 U.S.S.C. Report, at 124-25.

defendants, including drug traffickers convicted under 21 U.S.C. § 841 whose offenses involved "a substantial quantity of a controlled substance." *See* 28 U.S.C. § 994(I)(5). Congress defined what it considered to be "substantial quantit[ies]" of crack when it enacted the mandatory minimum sentence quantity thresholds. Accordingly, the Sentencing Commission built the crack cocaine offense level guidelines around the five- and fifty-gram thresholds for the five- and ten-year statutory mandatory prison terms. To incorporate the required statutory mandatory minimum sentences into the Guidelines, the Commission first assigned an offense level of 26 to offenses involving 5 grams of cocaine base, which resulted in a sentencing range of 63-78 months for a defendant in Criminal History Category I, and an offense level of 32 to offenses involving 50 grams of cocaine base, which resulted in a sentencing range of 121-151 months for a defendant in Criminal History Category I. 1995 U.S.S.C. Report, at 125-26. Then, to avoid creating gross disparities in the sentences imposed for offenses involving other amounts of crack, the Guidelines were adjusted proportionally up and down in two-level increments. *Id.*; *see also* U.S.S.G. § 2D1.1, cmt. background (noting Commission's conclusion that "a logical sentencing structure for drug offenses" requires that Guidelines sentences be coordinated with statutory mandatory minimum requirements); *United States v. Pho*, Nos. 05-2455 & 05-2461, 2006 WL 20574, at *2 (1st Cir. Jan. 5, 2006) ("[W]hile Congress designed the 100:1 ratio to operate at the minimum and maximum poles of the mandatory statutory sentencing ranges, it was the Commission that incorporated the ratio root and branch into its calculation of every cocaine offender's guideline sentencing range (GSR)."). Similar base offense levels reflecting the 100:1 drug quantity differential were designed for powder cocaine offenses. 1995 U.S.S.C. Report, at 125-26.

Although the 100:1 ratio often is used to describe the resulting difference between crack and powder cocaine sentences, that reference is misleading because the actual sentencing differential is obviously much lower. A Department of Justice report indicated that, in the year 2000, the 100:1 drug quantity ratio caused the average sentence for trafficking in crack cocaine to be 1.6 times the average sentence for trafficking in powder cocaine; depending on the amount of the drug involved and specific offender characteristics, crack sentences ranged from 1.3 to 8.3 times longer than powder sentences. U.S. Department of Justice, *Federal Cocaine Offenses: An Analysis of Crack and Powder Penalties* 19 (Mar. 19, 2002) ("2002 DOJ Report"). The average sentence for trafficking in powder cocaine in that year was 74 months, and the average crack cocaine sentence was 117 months. *Id.* at 21.

3.    *The Mandatory Minimum Sentencing Reform Act of 1994*

By 1994, Congress had concluded that statutory mandatory minimum sentences often prevented sufficient recognition of appropriate mitigating factors for defendants convicted of trafficking in amounts of drugs at or just above the mandatory minimum drug quantity thresholds. *See* H.R. Rep. No. 103-460, at 4-5 (to accompany the Mandatory Minimum Sentencing Reform Act of 1994, H.R. 3979). To correct this unintended anomaly, Congress enacted a "safety valve" provision to "permit a narrow class of defendants, those who are the least culpable participants in [drug trafficking] offenses, to receive *strictly regulated reductions* in prison sentences for mitigating factors currently recognized under the federal sentencing guidelines." *Id.* at 2 (emphasis added); *see* 18 U.S.C. § 3553(f).

Reflecting Congressional intent to "strictly regulate[]" sentences for defendants who qualify for safety valve relief, the safety valve provision eliminated only the statutory mandatory minimum

-14-

sentence, and expressly required the sentencing court to "impose a sentence pursuant to [the] guidelines." *See* 18 U.S.C. § 3553(f).[8/]  In addition, the Mandatory Minimum Sentencing Reform Act directed the Commission to ensure "that the lowest sentence in the guideline ranges that would apply to defendants meeting [the safety valve] criteria will be at least two years in the case of defendants now subject to a five year [mandatory] minimum [sentence]."  H.R. Rep. 103-460, at 5. As for safety valve-eligible defendants who were responsible for larger drug quantities, Congress said it expected that "[g]uidelines ranges for other offenders would . . . increase progressively, in proportion to indicia of increased culpability or seriousness, from the floor of the two-year guideline range."  *Id.*

4.    *The 1995 Sentencing Commission Report on Cocaine Policy*

Also in 1994, Congress directed the Sentencing Commission to address the differences in penalty levels that applied to the different forms of cocaine, and to submit recommendations for the retention or modification of such differences.  *See* Omnibus Violent Crime Control Act of 1994, Pub. L. No. 103-322, § 280006.  In February 1995, the Sentencing Commission presented Congress with a special report entitled *Cocaine and Federal Sentencing Policy* ("1995 U.S.S.C. Report").  The Commission reviewed available data that addressed the relationship between crack and powder cocaine use and trafficking and the concerns that had led Congress to impose higher penalties for crack cocaine offenses.  As Defendant Clark points out, the Commission concluded, for a number of reasons, that the 100:1 quantity ratio "should be re-examined and revised."  1995 U.S.S.C. Report, at 197.

---

8/    In light of *Booker*, that requirement, tied as it is to a Guidelines range, has been held to be advisory.  *See, e.g.*, *United States v. Duran*, 383 F. Supp. 2d 1345, 1346-47 (D. Utah 2005). The United States agrees.  *See id.* at 1349-50.

At the same time, the Commission agreed that the available evidence supported a legislative inference that "crack cocaine poses greater harms to society than does powder cocaine," and, therefore, that "important distinctions between the two may warrant higher penalties for crack than powder." 1995 U.S.S.C. Report, at xiv, 195. Specifically, the Commission found that:

(1)    "there is a greater likelihood of addiction resulting from the casual use of crack cocaine than from the casual use of powder cocaine" and "the higher addictive qualities associated with crack combined with its inherent ease of use can support a higher ratio for crack over powder," 1995 U.S.S.C. Report, at 181, 183;[9/]

(2)    "most cocaine-related emergency room admissions result from smoking crack, [although] most cocaine-related deaths result from injection of powder," *id.* at 184;[10/]

(3)    "the available research suggests that crack cocaine is significantly associated with systemic crime — that is, crime related to its marketing and distribution," and that "there appears to be more criminal activity associated with crack cocaine use and distribution than with powder cocaine use and distribution," *id.* at 185;

(4)    "crack offenders have worse criminal records than any other category of federal drug defendants," and crack offenders "are more likely to have a recent criminal record than any other category of drug offender," *id.* at 185-86;

---

9/    Both crack and powder cocaine are psychologically, rather than physiologically, addictive. Powder cocaine can be snorted or injected; crack cocaine can only be smoked. The Commission found that, compared to snorting powder cocaine, smoking crack or injecting powder produces more intense, though shorter-lived, effects, which, in turn, lead to more frequent use and a greater likelihood of drug dependence. Although the effects of smoking crack and injecting powder are similar, crack is the more popular drug, probably because of its relative ease of use. Thus, in general, crack use is more likely to lead to addiction than powder use. *See* 1995 U.S.S.C. Report, at 182-83.

10/    Although injecting powder cocaine is potentially more dangerous, the Commission found that the vast majority of cocaine users snort powder (75 percent) or smoke crack (28 percent). Only 10 percent inject powder. 1995 U.S.S.C. Report, at 183 n.3. As the figures suggest, some users ingest cocaine by more than one method.

(5)     although powder cocaine was used more often than crack by people in all age groups, a higher percentage of twelve- to seventeen-year-olds used crack compared to older users, and, "while both powder cocaine and crack cocaine distributors often are young, those involved in distributing crack are younger," *id.* at 186-87; and

(6)     crack cocaine is relatively easy to manufacture and "can be marketed in smaller, more cheaply priced units, thereby rendering it more appealing to people with less money," *id.* at 188-89.

Although the Commission "strongly recommend[ed] against a 100-to-1 ratio," it was not prepared to make specific recommendations for a new ratio or other changes in the crack/powder sentencing structure. *Id.* at 198. Rather, it told Congress that it would present more comprehensive proposals in the next Guidelines amendment cycle. *Id.* at xiv-xvi, 198-200. Despite its recognition that empirical data supported higher penalties for crack offenses, three months after issuing its report, the Commission proposed a set of amended sentencing guidelines that, among other changes, would have eliminated the difference in penalties for crack and powder cocaine by establishing the same base offense levels for trafficking in the same quantities of each drug, specifically the higher quantities required under the powder cocaine Guidelines. *See* 60 Fed. Reg. 25074 *et seq.* (May 11, 1995).[11/] The effect was to lower crack cocaine penalties.

After holding hearings on the Commission's proposal to equalize crack and powder cocaine penalties, Congress concluded that there still were valid reasons for treating crack offenders more severely than other drug offenders, specifically:

[C]rack is more addictive than powder cocaine; it accounts for more emergency room visits; it is most popular among juveniles; it has a greater likelihood of being

_____

11/     Although all seven members of the United States Sentencing Commission in 1995 believed that the disparity between crack and powder cocaine sentences was too great, three Commissioners dissented from the proposal to equalize penalties. H.R. Rep. No. 104-272, at *22 n.1 (1995), *reprinted in* 1995 U.S.C.C.A.N. 335, 355 n.1.

> associated with violence; and crack dealers have more extensive criminal records than other drug dealers and tend to use young people to distribute the drug at a greater rate. In short, the evidence overwhelmingly demonstrates significant distinctions between crack and powder cocaine.

H.R. Rep. No. 104-272, at *3 (1995), *reprinted in* 1995 U.S.C.C.A.N. 335, 337. Those reasons were consistent with the Commission's own findings. Congress also found that, if the Commission's amendments were allowed to go into effect without a corresponding change in the statutory mandatory minimum sentences, "gross sentencing disparities" would be created because sentences just below the statutory minimum would be greatly reduced while the mandatory sentences would remain high. H.R. Rep. No. 104-272, at *4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 335, 337. As a result, Congress invoked its statutory disapproval authority and rejected the amendment that would have equalized sentences for crack and powder cocaine offenses. *See* 28 U.S.C. § 994(p). Congress acknowledged, however, that the existing "100:1 quantity ratio may not be the appropriate ratio." H.R. Rep. No. 104-272, at *4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 335, 337. Accordingly, the disapproval legislation directed the Commission to re-examine the crack/powder differential and develop new recommendations that reflected certain specific considerations. Primary among those considerations was the principle that "the sentence imposed for trafficking in a quantity of crack cocaine should generally exceed the sentence imposed for trafficking in a like quantity of powder cocaine." Pub. L. No. 104-38, 28 U.S.C. § 994 note.

5.    *The 1997 Sentencing Commission Report on Cocaine Sentencing Policy*

In April 1997, the Sentencing Commission issued another special report to Congress entitled *Cocaine and Federal Sentencing Policy* ("1997 U.S.S.C. Report") that unanimously recommended a significant narrowing, *but not an equalization*, of the ratio of crack to powder penalties. Referring

primarily to the findings of the 1995 report, the Commission again concluded that the 100:1 quantity ratio was unsupportable, but it also "reiterate[d] the conclusion from its 1995 report that federal sentencing policy must reflect the greater dangers associated with crack." 1997 U.S.S.C. Report, at 2, 4. Consequently, the Commission recommended that the differential between crack and powder sentences be reduced by raising the quantity threshold for crack offenses and lowering the quantity threshold for powder cocaine offenses.[12] In particular, the Commission noted that a lower powder cocaine threshold would reflect the fact that nearly all cocaine is "initially distributed in powder form until later in the distribution chain when it is converted into crack." *Id.* at 5. The Commission did not propose amendments to the Guidelines to implement its recommended changes, however.

In response to the Commission's 1997 Report, members of Congress introduced a number of bills addressing the crack/powder cocaine sentencing differential. These bills took varying approaches to the concerns raised by the Commission. Some would have equalized penalties by raising the statutory crack cocaine thresholds; others would have done so by lowering the statutory powder cocaine thresholds; and still others would have adopted, in some form, the Commission's proposal to amend both the powder and crack cocaine thresholds to reduce, but not eliminate, the differential between penalties for offenses involving the two forms of the drug. *See* U.S. Department of Justice, *Federal Cocaine Offenses: An Analysis of Crack and Powder Penalties* 18 (Mar. 19, 2002) ("2002 DOJ Report"). Ultimately, however, Congress could not agree on whether, how, or to what degree to revise the statutory thresholds that triggered the mandatory minimum sentences.

---

[12]    Specifically, the Commission recommended that Congress raise the crack threshold for the five-year mandatory minimum sentence from 5 grams to between 25 and 75 grams, and lower the comparable threshold for powder cocaine from 500 to between 125 and 375 grams, thereby creating a 5:1 quantity ratio. 1997 U.S.S.C. Report, at 2, 5, 9.

6.    *The 2002 Sentencing Commission Report on Cocaine*
       *Sentencing Policy*

On December 12, 2001, the Senate Judiciary Committee asked the Sentencing Commission to update its 1997 Report to provide guidance as Congress continued to evaluate the appropriateness of the penalty differential between crack and powder cocaine. In 2002, the Commission issued a third report entitled *Cocaine and Federal Sentencing Policy* ("2002 U.S.S.C. Report"), which again concluded that the 100:1 ratio was no longer supportable. Specifically, the 2002 Report found that the 100:1 quantity ratio should be reduced for several reasons. First, current empirical data suggested that the penalties for crack and powder cocaine were disproportionate to the relative harms presented by the two forms of the drug. Second, some of the harms associated with crack could be addressed more precisely by adopting specific Guidelines enhancements that would apply to all drug offenses. Third, the severe crack penalties seemed to fall disproportionately on lower-level participants in drug offenses and, most significantly, on African-Americans. 2002 U.S.S.C. Report, at v-viii.

Still, the 2002 Report acknowledged, "differences in the intrinsic harms" posed by crack and powder cocaine, and "differences in other harms [associated with crack] that cannot be adequately accounted for by specific sentencing enhancements" justified punishing crack offenses more severely than powder cocaine offenses involving the same amount of drugs. *Id.* at 92. Data compiled by the Commission and by the Department of Justice in 2002 still supported several of the key findings that originally caused Congress to impose more severe penalties for crack cocaine than for powder cocaine. For example, more recent data continued to indicate that crack is generally more addictive than powder cocaine, *see* 2002 DOJ Report, at 3; 2002 U.S.S.C. Report, at 19, 94 (stating that "crack

-20-

cocaine always represents the most addictive form of cocaine"), and, although the majority of both

crack and powder cocaine offenses did not involve direct violence, crack cocaine offenses were still

more often associated with other serious criminal behavior, including systemic violence, than powder

cocaine, *see* 2002 DOJ Report, at 8-9;[13] 2002 U.S.S.C. Report, at 57.[14]   The Commission also

reaffirmed that crack posed unique societal problems because it could be sold in smaller and cheaper,

yet potent, doses and thus was more readily available to larger segments of the population, including

the most vulnerable.  2002 U.S.S.C. Report, at xiii-xiv.  On the other hand, the Commission found

that more recent data no longer supported earlier views that crack cocaine had a greater physiological

effect than powder cocaine and was more likely to be used by young people.[15]

---

[13]      A study conducted in November 2000 concluded that, in the absence of crack, urban crime rates in 1991 would have been 10 percent lower.  *See* 2002 DOJ Report, at 8-9.  The study also found that the most prevalent form of violence related to crack cocaine use was aggravated assault. *Id.* at 9.  Additionally, a 1998 study identified crack as the drug most closely related to trends in homicide rates.  *Id.*

[14]      Even though data reported by the Commission indicated that the majority of crack and powder cocaine offenses did not involve weapons, crack offenses were more likely to involve weapons than were powder cocaine offenses (25.5 percent of crack offenses versus 17.6 percent of powder offenses involved weapons).  2002 U.S.S.C. Report, at 54.  Similarly, although rare in both kinds of offenses, crack offenses were more likely than powder cocaine offenses to involve bodily injury.  2002 U.S.S.C. Report, at 57.

[15]      Contrary to the findings of the Commission in 1995, 1995 U.S.S.C. Report, at 33-34, 83-84, the 2002 Report found that relatively few young people used crack or powder cocaine, and that young people who did use cocaine were more likely to use powder.  *See* 2002 U.S.S.C. Report, at 96.  The data also indicated that the involvement of minors in crack or powder cocaine offenses had declined significantly between 1995 and 2000.  *Id.* at 57.  But although minors' rates of participation in both kinds of offenses were relatively low, crack offenses were more than twice as likely as powder cocaine offenses to involve minors (4.2 percent compared to 1.8 percent in 2000). *Id.*

The 2002 Report recommended that Congress

(1)    establish a new 20:1 crack/powder ratio by "increas[ing] the five-year mandatory minimum threshold quantity for crack cocaine offenses to at least 25 grams and the ten-year threshold quantity to at least 250 grams";

(2)    direct the Commission to devise specific enhancements to the drug trafficking Guideline for all drugs, to account for certain aggravating factors, such as involvement of a dangerous weapon, bodily injury caused by violence, and distribution to youth or employment of minors in distribution; and

(3)    maintain the current thresholds for powder cocaine offenses.

*Id.* at viii.  As with the recommendations from its 1997 Report, the Commission did not formally propose amendments to the Guidelines based on its 2002 recommendations.[16]  Congress has held hearings on the latest Commission recommendations,[17] but it has not reached a consensus in support of those specific proposals.  Members of Congress continue to hold different views on whether, how, and to what extent, changes in the existing crack/powder sentencing structure should be made.

**B.    *A sentence that ignored the Guidelines in favor of the Sentencing Commission's recommendations would be unreasonable*.**

As we have shown, following *Booker*, a sentence within the sentencing range called for by the existing Guidelines is presumptively reasonable, and that sentence is entitled to deference.  Such deference is especially appropriate in this case because the drug trafficking Guidelines are based on the statutory mandatory minimum sentencing quantity thresholds for cocaine offenses chosen by Congress.  Defendant Clark asks this Court to reject the recommended Guidelines sentence and to treat him as though he had been convicted of trafficking in powder, rather than crack, cocaine.  Mem.

---

16/    The Commission did, however, develop a prototypical set of revised Guidelines to illustrate its recommendations.  *See* 2002 U.S.S.C. Report app.

17/    The Senate Judiciary Committee, for example, held hearings on the Commission's proposal in May 2002.

2.  We submit that such an equalization of crack and powder penalties, or the adoption of any of the reduced penalties for crack cocaine offenses made by the Sentencing Commission in its various reports, would be unreasonable and an abuse of discretion because it would (1) ignore express Congressional intent regarding the appropriate level and relative severity of penalties for crack cocaine offenses; (2) lead to unwarranted disparities in sentences for defendants who are guilty of dealing in the same quantities of crack; and (3) if applied as a categorical rule against imposing sentences based on the crack Guidelines, would conflict with the Supreme Court's directive to consider the Guidelines in every case.

The federal drug statutes and corresponding sentencing Guidelines reflect a Congressional policy choice that trafficking in crack cocaine should be punished more severely than trafficking in powder cocaine. *See United States v. Anderson*, 82 F.3d 436, 437-38 (D.C. Cir. 1996). Even if the Sentencing Commission believes that the current crack sentencing policy is unjustified, Congress clearly does not agree. Congress has not adopted the Commission's proposals to reduce the differential between penalties for crack and powder cocaine offenses, and it emphatically has rejected the idea that sentences for crack offenses should be the same as sentences for powder cocaine offenses. *Id.*

Reasonable people may disagree over the relative merits of the Commission's recommendations or Congress's choices, but it is beyond debate that the ultimate authority to decide the severity of cocaine sentences rests exclusively with Congress. *See, e.g.*, *United States v. Evans*, 333 U.S. 483, 486 (1948) (stating that power to set punishment for federal crimes belongs solely to Congress). Because the crack Guidelines mirror Congress's policy choices, it would be unreasonable for the Court to impose a sentence below the advisory Guidelines sentence solely because the Court

-23-

prefers the Commission's recommendations to Congress's policy choices. Although a district court may disagree publicly with the laws it is sworn to uphold, *Webb*, 134 F.3d at 409, it is not free to substitute its "own sense of justice" for the Congressional policy choices that are reflected in the Sentencing Guidelines. *See United States v. Perkins*, 108 F.3d 512, 515 (4th Cir. 1997). *Booker* gives sentencing courts greater leeway to disagree with the Guidelines in individual cases, but it does not leave courts "free to disagree about the fundamental premises of sentencing, [or] to implement their own perceptions of what policies should drive punishment." *United States v. Jaber*, 362 F. Supp. 2d 365, 370 (D. Mass. 2005)*; see also United States v. Tabor*, 365 F. Supp. 2d 1052,1059-60 (D. Neb. 2005) (stating that even though Court strongly disagrees with the crack Guidelines, "judge-made" changes to the Guidelines would be undemocratic and not necessarily superior to Congress's choices); *Jaber*, 361 F. Supp. 2d at 381 (rejecting defendant's request for sentence of "time served" and stating that "Congress and the Commission have expressed their deep concern that pseudoephedrine offenses be treated seriously. I am not free to reject that approach based on my personal predilection . . . .").

Adherence to that principle reflects proper deference to the critical difference between the roles played by the judicial and legislative branches in our constitutional system.[18] Where a policy choice does not offend the Constitution — and our Court of Appeals repeatedly has upheld the

---

18/    The Supreme Court underscored the importance of this distinction when it upheld the constitutionality of Congress's delegation of sentencing authority to the Sentencing Commission. *See Mistretta v. United States*, 488 U.S. 361, 364 (1989) ("Congress, of course, has the power to fix the sentence for a federal crime, *United States v. Wiltberger*, 18 U.S. (5 Wheat) 76 . . . (1820), and the scope of judicial discretion with respect to a sentence is subject to congressional control. *Ex parte United States*, 242 U.S. 27 . . . (1916).").

crack/powder cocaine sentencing differential against constitutional challenges[19] — "[i]t is not for

[the courts] to decide whether the 100:1 ratio is wise or equitable; that is a question for the popularly

chosen branches of government." *United States v. Lewis*, 90 F.3d 302, 306 (8th Cir. 1996).[20]

Indeed, in our own District, Judge Bates recently reaffirmed the need for deference to Congress's

policy judgments in rejecting a defendant's argument that the crack/powder differential was

unreasonable and unwarranted: "Judges are not authorized by *Booker* — or any other legal authority,

for that matter — to substitute their own ideas about sound penological policy for the policy chosen

by Congress, whether it be Congress's choice to punish crack offenders more severely than powder-

cocaine offenders or Congress's broader policy of treating drug weight as a measure of (or a proxy

---

[19] *See, e.g.*, *United States v. Holton*, 116 F.3d 1536 (D.C. Cir. 1997) (equal protection); *United States v. Edwards*, 98 F.3d 1364 (D.C. Cir. 1996)(equal protection, Eighth Amendment); *United States v. Walls*, 70 F.3d 1323 (D.C. Cir. 1995) (Eighth Amendment); *United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994) (equal protection); *United States v. Thompson*, 27 F.3d 671 (D.C. Cir. 1994) (equal protection and Eighth Amendment; also collecting cases); *United States v. Cyrus*, 890 F.2d 1245 (D.C. Cir. 1989) (equal protection, Eighth Amendment, due process (vagueness)). Defendant Clark contends that there are new reasons to support an equal protection challenge to the crack cocaine penalty structure, Mem. 18, but, as we show *infra*, his arguments are without merit.

[20] *See also, e.g.*, *United States v. Gaines*, 122 F.3d 324, 330 (6th Cir. 1997) ("Reasonable minds can differ as to whether Congress or the Sentencing Commission chose the best policy, but as long as the 100:1 ratio does not violate the Constitution, it is for Congress to make the policy choices, not the Sentencing Commission or the courts."); *United States v. Berger*, 103 F.3d 67, 71 (9th Cir. 1996) (rejecting "the notion that a district court may override the express intention of Congress regarding penalties for crack cocaine and powder cocaine. . . . It is not the province of this Court to second guess Congress's chosen penalty"); *United States v. Fonts*, 95 F.3d 372, 374 (5th Cir. 1996) ("[I]t is not the province of this Court to second guess Congress'[s] chosen penalty. That is a discretionary legislative judgment for Congress and the Sentencing Commission to make."); *United States v. Sanchez*, 81 F.3d 9, 11 (1st Cir. 1996) ("[W]e cannot blind our eyes to the fact that the Congress shot down the Commission's recommendation [to equalize sentences for crack and powder cocaine offenses]."); *United States v. Alton*, 60 F.3d 1065, 1071 (3d Cir. 1995) ("We defer to Congress and the Sentencing Commission to address the related policy issues [involving the disparate impact of crack cocaine penalties on African-Americans] and to consider the wisdom of retaining the present sentencing scheme.").

for) culpability." *United States v. Doe*, No. 02-CR-0406, slip op. at 13 (D.D.C. Jan. 26, 2006) (Bates, J.).

Similarly, before *Booker*, the D.C. Circuit emphasized this point in the context of deciding the scope of the broad departure authority created by U.S.S.G. § 5K2.0, stating, after Congress rejected the Commission's proposed 1995 amendment to equalize crack and powder cocaine penalties, that a "district court has no authority to override Congress, and 'enact' (via the broad departure authority of U.S.S.G. § 5K2.0) the Commission's proposed amendment." *United States v. White*, 71 F.3d 920, 928 (D.C. Cir. 1995); *see also, e.g.*, *Webb*, 134 F.3d at 407 ("The district court's disagreement with the [Congressional] policies embedded in the Sentencing Guidelines does not authorize it to depart."). *Booker* does not undercut that conclusion. Although *White* and *Webb* were discussing a court's authority to depart from the Guidelines, they were not simply construing the extent of that authority under the Guidelines or Section 3553. Rather, these cases were applying broader principles involving the proper relationship between Congress and the courts when it comes to sentencing policy. Those principles are as applicable to a post-*Booker* decision to impose a non-Guidelines sentence as they are to a decision to depart from the Guidelines.

1.   *Applying non-Guidelines sentences to the entire category of crack cocaine offenses would cause unwarranted sentencing disparities.*

Ignoring the punishment scheme for crack cocaine also would directly contradict 18 U.S.C. § 3553 and *Booker*, which both "require[] judges to consider the . . . the need to avoid unwarranted sentencing disparities . . . ." If this Court were to ignore the Guidelines sentence and substitute one derived from any of the Commission's alternative crack sentencing formulas, then Defendant Clark's sentence would be unfairly disproportionate to the sentences of all the other defendants who

committed the same act, but who drew a sentencing judge who honored the Sentencing Guidelines, or a judge who also disagreed with the Guidelines' current 100:1 ratio, but chose a different remedy. As the First Circuit observed in *Pho*, "if sentencing courts are free to replace the 100:1 ratio with whatever ratio they deem appropriate, the sentences of defendants for identical 'real conduct' will depend largely on which judge happens to draw a particular case." 2006 WL 20574, at *10; *see also Doe*, No. 02-CR-0406, slip op. at 14 (noting that "a categorical deviation . . . from the advisory Guidelines range for a crack-offense sentence, based solely on the conclusion that the disparity between the sentences for crack and powder cocaine is unwarranted . . . would in all likelihood create greater inter-court (and intra-court) sentencing disparity"). "It is hard to imagine a more flagrant violation of the Guidelines' purpose to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct." *In re Sealed Case*, 292 F.3d 913, 915-16 (D.C. Cir. 2002) (internal quotation marks and citations omitted).

As the *Pho* court noted, this is no longer a hypothetical problem. "[I]n the wake of *Booker*, some sentencing courts have continued to impose sentences for crack offenses in lockstep with the sentencing guidelines and the 100:1 ratio while others have imposed reduced sentences based on varying ratios." 2006 WL 20574, at *10 (citing *United States v. Gipson*, 425 F.3d 335, 337 (7th Cir. 2005) (affirming sentence based on 100:1 ratio); *United States v. Smith*, 359 F. Supp. 2d 771, 782 (E.D. Wis. 2005) (adopting a 20:1 ratio); *United States v. Fisher*, No. S3 03 CR 1501, 2005 WL 2542916, at *6 (S.D.N.Y. Oct. 11, 2005) (adopting a 10:1 ratio)). In addition to the cases cited in *Pho*, several other courts have used various ratios to calculate reduced sentences for crack cocaine offenses. *E.g.*, *United States v. Perry*, 389 F. Supp. 2d 278, 303 (D.R.I. 2005) (applying a 20:1 ratio); *United States v. Clay*, No. 2:03 CR 73, 2005 WL 1076243, at *5-6 (E.D. Tenn. May 6, 2005)

(sentencing defendant to 156 months, well below the Guidelines range of 235 to 293 months, in part

because of "[t]he unjustified disparity in the 100:1 qua[nt]ity ratio for punishment between cocaine

base or crack and powder cocaine"); *United States v. Williams*, 372 F. Supp. 2d 1335, 1339 (M.D.

Fla. 2005) (considering crack/powder differential in sentencing a defendant to 204 months rather

than 360 months). And in this District, at least one judge has found that the crack/powder

differential justified sentences below the Guidelines range for crack cocaine, whereas another has

rejected that argument. *Compare United States v. Harris*, No. 04-CR-0157, slip op. at 1-3 (D.D.C.

Mar. 3, 2005) (Robertson, J.), *with Doe*, No. 02-CR-0406, slip op. at 20 (Bates, J.).

Ignoring the crack cocaine guidelines also would create an unwarranted disparity between

those defendants who are sentenced under the Guidelines and those whose sentences are driven by

the statutory mandatory minimums. As the *Pho* court explained:

> Under the Act, a first-time offender convicted of an offense involving fifty or more
> grams of crack cocaine is subject to a ten-year mandatory minimum sentence.
> Because the current guidelines were constructed around the mandatory minimums,
> a first-time offender convicted of an offense involving, say, forty-nine grams of crack
> would likely encounter a [Guidelines sentencing range] of 97-121 months. If,
> however, a sentencing court displaced the guidelines by applying a 20:1 crack-to-
> powder ratio, the second offender's [Guidelines sentencing range] would plummet
> to 63-78 months. In short, a one-gram difference would create a huge sentencing
> differential (nearly fifty percent). It was exactly this sort of concern that drove
> Congress's decision to reject the proposed guideline amendments in 1995.

*Pho*, 2006 WL 20574, at *10 (internal citations omitted); *see Anderson*, 82 F.3d at 440-41 (noting

that abandonment of 100:1 ratio "would greatly exacerbate" sentencing disparities among defendants

convicted of trafficking in similar amounts of crack cocaine). Although Defendant Clark urges the

Court to follow the Commission's recommendations, "it is significant that the Commission's reform

proposal[s] included an explicit invitation to Congress to change the mandatory minimums

-28-

themselves," thus signifying that the Commission itself would not endorse sentencing practices that were out of sync with Congressional directives. *Id.* at 441. "So far as appears, [the Commission] has not altered its original view that 'a logical sentencing [structure] for drug offenses' requires refinements coordinated with the mandatory minimums." *Id.* (internal citation omitted). The failure to ensure coordination with the statutory penalties was one of the reasons that Congress disapproved the Commission's unilateral action to equalize crack and powder cocaine penalties in 1995. *See supra*, at 18.

Relying on a recent decision from a Wisconsin district court, *United States v. Smith*, No. 02-CR-163, 2005 WL 549057 (E.D. Wis. Mar. 3, 2005), Defendant Clark asserts that the crack Guidelines should not be followed and that this Court instead should implement the Commission's crack sentencing proposals to reduce an unwarranted disparity between sentences for crack and powder cocaine offenses. Mem. 32-33. That is the wrong comparison.[21/] Because Congress has determined that crack offenses are different from other drug offenses, including powder cocaine offenses, the relevant comparison, for sentencing purposes, is between crack offenses. *E.g.*, *Tabor*, 365 F. Supp. 2d at 1059-60 (stating that the Guidelines reflect Congress's "quintessentially legislative" determination that trafficking in crack cocaine is worse for society and thus is "justly punished more harshly than other drugs"). "[W]hat counts is the uniformity *sought by Congress*." *Pho*, 2006 WL 20574, at *11 (emphasis in original). "Congress plainly believed that not all cocaine offenses are equal and that trafficking in crack cocaine involves different real conduct than

---

[21/]    The *Smith* court also concluded that it would follow the 2002 Commission recommendations in order to provide a "sentence no greater than necessary." *See* 18 U.S.C. § 3553(a). Again, this reasoning flies in the face of Congress's determination that the current penalties for crack offenses are necessary.

trafficking in powder.  Clearly, then, Congress intended that particular disparity to exist, and federal courts are not free to second-guess that type of decision."  *Id.*; *see also Doe*, No. 02-CR-0406, slip op. at 9 ("As a matter of criminal sentencing policy, this Court believes that the arguments against the 100:1 ratio have some merit, although not to the point of supporting a 1:1 ratio.  Be that as it may, however, the Court is not persuaded that it can craft a sentence based on such policy considerations and still remain faithful to the requirements of 18 U.S.C. § 3553.").

Similarly, in *Anderson*, the appellants asserted that the recommendations of the 1995 Commission Report (to equalize crack and powder cocaine penalties) was a circumstance unique to crack offenses and, because it was not common to all drug offenses, it was an "atypicality" that justified a departure from the Guidelines sentence for crack.  *Anderson*, 82 F.3d at 446 n.3 (Wald, J., dissenting).  The dissenting judge in *Anderson*, who would have upheld a departure for other reasons, concluded that the appellants were making the wrong comparison: "Since each type of controlled substance listed in the guidelines presents fairly unique risks of harm to the user and the surrounding community, the relevant group of similar offenses for determining the typicality of a circumstance is possession or sale of the same controlled substance which the defendant possessed or sold, not possession or sale of all controlled substances."  *Id.*  For the same reasons, wholesale adjustments to crack penalties in order to treat crack offenders the same as powder cocaine offenders would ignore Congress's intent that defendants who commit similar acts be sentenced similarly and that crack offenders be punished more severely than powder cocaine offenders.  To avoid such unreasonably disproportionate sentences, sentencing courts should adhere to the Guidelines sentences for crack offenses.

>    2.    *Applying a categorical rule to effectively reduce the sentences of all crack offenders would be unreasonable.*

That is not to say that, following *Booker*, a non-Guidelines sentence in a crack cocaine case will always be unreasonable. But in order to avoid producing unwarranted disparities, district courts should impose non-Guidelines sentences only where justified by compelling individual circumstances not captured by the Guidelines system. *See Booker*, 125 S. Ct. at 767 (noting that the requirement that sentencing courts "must consult [the] Guidelines and take them into account when sentencing" would "continue to move sentencing in Congress's preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient *to individualize* sentences where necessary") (emphasis added); *Doe*, 02-CR-0406, slip op. at 16-17 (noting that individual factors in a given case might justify sentence below Guidelines range for crack offenses but that "courts cannot *categorically* treat as similar that which Congress has chosen to treat as dissimilar") (emphasis added).

Our Circuit repeatedly has held that the crack/powder sentencing differential is not an individual circumstance that would justify departing from the Guidelines range. *E.g.*, *Anderson*, 82 F.3d at 443 ("[A] circumstance [like the crack/powder cocaine differential] present in every case for an offense described by a particular guideline is not a 'circumstance . . . that should result in a sentence different from that described [in the Guidelines].'"); *see also Sealed Case*, 292 F.3d at 212 (stating that the crack/powder disparity, "which is implicated in all cocaine cases," cannot justify a departure); *United States v. Thompson*, 27 F.3d 671, 679 (D.C. Cir. 1994) (stating that crack/powder disparity did not justify departure because "if the disparate racial impact of the guideline ranges for 'crack' offenses warranted a departure in *any* case, it would warrant a departure in *every* case")

(emphasis in original). After *Booker*, the First Circuit has held that a district court's rejection of the Guidelines' disparate treatment of crack and powder cocaine "[was] not grounded in case-specific considerations," but rather "in general disagreement with broad-based policies enunciated by Congress or the Commission, as its agent," and therefore constituted legal error under *Booker*. *Pho*, 2006 WL 20574, at *11-*12.

Like the defendant in *Pho*, Defendant Clark asks this Court to adopt a uniform rule that it will never apply the Guidelines for crack offenses because those Guidelines reflect a 100:1 powder/crack ratio. A categorical refusal to apply the crack Guidelines in all crack cases cannot be squared with *Booker*'s directive to "consider the Guidelines and take them into account" in every case. The Court would commit "statutory error" if it failed to "consider" the applicable crack Guidelines range, and "instead simply selected what [it] deemed an appropriate sentence without such required consideration." *Crosby*, 397 F.3d at 115. Such an error would render the resulting sentence "unreasonable," regardless of its length or other characteristics. *Id.* at 114.

Moreover, application of such a categorical sentencing rule is inconsistent with the Court's duty to exercise discretion on a case-by-case basis. Ordinarily it is an abuse of discretion "when the trial court, while recognizing its right to exercise discretion, 'declines to do so, preferring instead to adhere to a uniform policy.'" *Houston v. United States*, 592 A.2d 1066, 1067 (D.C. 1991) (citation omitted) (reversing and remanding for resentencing where sentencing judge had established policy of not applying available sentencing provision when certain circumstances were present). "[T]he discretion called for . . . is the exercise of discretion in individual cases, not the discretion of the trial judge to adopt a uniform policy . . . in all cases." *United States v. Queen*, 435 F.2d 66, 67 (D.C. Cir. 1970). Thus, the sentence that Defendant Clark seeks would be unreasonable.

III.    **The Guidelines Penalties for Crack Cocaine Offenses Are Constitutional.**

Defendant Clark also asserts that the existing penalties for crack offenses violate his equal protection rights because "Congress has reaffirmed the disparity in [crack/powder] sentencing almost entirely for racial reasons," specifically "because of its adverse impact on African-Americans." Mem. 27, 29.  Because the crack sentencing scheme constitutes purposeful racial discrimination, Defendant Clark maintains, it should be subject to strict scrutiny, which it fails.[22]  *Id.* at 16. Defendant Clark's argument is meritless.[23]

Indeed, the same argument that Defendant Clark now makes was raised and rejected in *United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994), which involved a challenge to the 1986 legislation that created the crack/powder sentencing differential and the related Guidelines.  In *Johnson*, the Circuit held that "to trigger strict scrutiny, . . . appellants must show more than that the sentencing scheme has a disproportionate impact on those African-Americans who are convicted of cocaine-related offenses.  The Supreme Court has required that a 'decisionmaker . . . selected or

---

[22]    "If [the strict scrutiny] standard governed, [the court] would be obliged to ask . . . whether the statute is narrowly tailored to serve a compelling state interest."  *Johnson*, 40 F.3d at 439.

[23]    Invalidation of an act of Congress is not to be undertaken lightly.  As Justice Stevens observed in his dissenting opinion in *Booker*:

> It is a fundamental premise of judicial review that all Acts of Congress are presumptively valid.  *See Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984).  "A ruling of unconstitutionality frustrates the intent of the elected representatives of the people."  *Ibid.*  In the past, because of its respect for the coordinate branches of Government, the [Supreme] Court has invalidated duly enacted statutes — or particular provisions of such statutes — "only upon a plain showing that Congress has exceeded its constitutional bounds."  *United States v. Morrison*, 529 U.S. 598, 607 (2000); *see also El Paso & Northeastern R. Co. v. Gutierrez*, 215 U.S. 87 (1909).

*Booker*, 125 S. Ct. at 774-75.

reaffirmed a course of action at least in part 'because of,' not merely 'in spite of,' its adverse effect upon an identifiable group.'" *Id.* at 439 (quoting *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)). "Disparate racial impact . . . can be probative of such purpose, but it is not dispositive without more." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 240 (1976)). To determine whether Congress had a discriminatory purpose in establishing the penalties for crack offenses, the Court examined "'the totality of the relevant facts,' including the disparate impact, [as well as] the historical background of the legislative scheme, the specific sequence of events leading up to the enactment, a departure from the normal procedural sequence, a substantive departure from a routine decision or rule, contemporary legislators' statements, and the 'inevitability or foreseeability of the consequence of the law.'" *Id.* at 440 (internal citations and emphasis omitted).

The *Johnson* appellants based their claim that Congress had a discriminatory purpose when it enacted the crack/powder penalties in 1986 "only on indications that the statute was passed hastily, without full committee hearings addressing all aspects of the statute, and on the alleged racial imagery contained in a few documents introduced into the Congressional Record and contemporaneous utterances of some legislators." *Id.* After examining the evidence, the *Johnson* court held that no racially discriminatory purpose could be attributed to Congress. *Id.* at 441.[24/] The D.C. Circuit also rejected the appellants' alternative argument that "the racially disparate impact of a legislative enactment — where particularly dramatic — can be used without more to infer discriminatory intent on the part of the decisionmaker." *Id.* That rule, the Court said, applies "only where there exists a clear pattern of starkly disparate impact 'unexplainable on grounds other than

---

[24/]     The Sentencing Commission reached the same conclusion in the 1995 Cocaine Sentencing Report on which Defendant Clark relies. *See* 1995 U.S.S.C. Report, at xii, 192.

race.'" *Id.* (internal citations omitted).  Because there was clearly a race-neutral explanation for

Congress's decision to punish crack offenses severely,[25] that alternative theory also failed.  *Id.*[26]

Defendant Clark attempts to distinguish *Johnson* on the grounds that it was decided before

the Commission issued its three cocaine sentencing reports, and before Congress rejected the

Commission's proposal to equalize crack and powder cocaine penalties. Mem. 18.  Relying on *dicta*

from a Second Circuit case and two Seventh Circuit cases in which concurring judges suggested that

such developments might support an equal protection challenge, Defendant Clark asserts that

because Congress must be aware of the disparate impact of its crack sentencing policies and the lack

---

[25]    "Congress acted in light of the distributional efficiencies, heightened potency and acute violence associated with crack cocaine." *Johnson*, 40 F.3d at 441.  The Commission's reports do not undercut those assumptions. *See supra*, at 16-17, 20-21.

The *Johnson* court also noted, as had another panel in an earlier equal protection case, *Thompson*, 27 F.3d at 678 n.3, that the law might actually benefit "African-Americans who live in areas plagued with crack distribution and use." *Johnson*, 40 F.3d at 441, n.2.  Contrary to Defendant Clark's suggestion, Mem. 15, the Circuit has never purported to rely on that observation as a justification for its holding that the crack/powder differential did not violate equal protection. Moreover, Defendant Clark's citation to *Shaw v. Hunt*, 517 U.S. 899 (1996), is unavailing because the rule in that case applies only where "race becomes the dominant and controlling consideration" motivating legislation. *See Shaw*, 517 U.S. at 905.  No such motivation has been shown here.

[26]    It is not at all clear that Defendant Clark has even made a sufficient threshold showing of disparate impact in the constitutional sense.  There is no doubt that a very high proportion of defendants convicted of crack offenses are African-American.  But as the Sentencing Commission found, "[i]n order to evaluate whether the crack cocaine penalties disproportionately impact blacks, data regarding the racial composition of the entire population of crack cocaine traffickers would be required." 2002 U.S.S.C. Report, at 103.  Because such data do not exist, the assertion of disproportionality "cannot be evaluated scientifically." *Id.*  Defendant Clark also points to the increasing gap between average sentences for crack and powder cocaine offenses as further evidence that the 100:1 quantity ratio has a disparate impact, Mem. 9-10, but that argument exaggerates the evidence.  Other factors, such as the fact that crack offenders tend to have more extensive criminal histories, also have a significant effect on the average sentencing rate. *See* 2002 U.S.S.C. Report, at 59.  None of this is to say that the *perception* that African-Americans are unfairly affected by crack sentencing policies is not a significant policy issue deserving of Congressional attention, but such a perception, however troubling, does not by itself prove a constitutional violation.

of support for them, but nonetheless has not reduced the penalties, there is now sufficient proof of a discriminatory purpose. Mem. 27-29. We know of no case — and Defendant Clark cites none — that actually has adopted this reasoning and found the crack penalty scheme unconstitutional. To the contrary, the D.C. Circuit has rejected an equal protection challenge brought after issuance of the Sentencing Commission's 1995 Report, in part because "[t]he opinions of the Sentencing Commission and scientific journals do not provide the requisite proof that Congress was motivated by any impermissible considerations." *United States v. Holton*, 116 F.3d 1536, 1548 (D.C. Cir. 1997); *see also United States v. Jackson*, 84 F.3d 1154, 1161 (9th Cir. 1996) (holding that Congress's decision to reject the Commission's proposal to equalize penalties does not affect "the precedential value of our ruling that Congress had a rational basis for the 100:1 ratio"); *United States v. Petersen*, 143 F. Supp. 2d 569, 586 (E.D. Va. 2001) (rejecting a claim that current crack cocaine sentencing scheme violated equal protection clause, even though presiding judge personally believed that "the equal protection clause was offended" by that scheme, because law as interpreted by Supreme Court did not support such a claim, and "it is not for district courts to rewrite standards set by the Supreme Court or the Court of Appeals").

To bolster his argument that *Johnson* is not controlling, Defendant Clark also argues that comments made during the debate over the bill to reject the Commission's 1995 proposal to equalize crack and powder cocaine penalties prove a discriminatory purpose. Although Congress voted to reject the Commission's equalization proposal by a vote of 332-83, the only "evidence" of discriminatory purpose that Defendant Clark identifies are the lone remarks of two congressmen who expressed their view that the best way to deter those dealers who trafficked crack directly into poor,

minority neighborhoods was to significantly increase the penalties for dealing crack. Mem. 26-27.[27]

Even assuming, solely for argument's sake, that a discriminatory purpose could be derived from such

remarks, the Court held in *Johnson* that "scattered pieces of legislative history are quite inadequate

to serve to attribute a discriminatory purpose to the Congress." *Johnson*, 40 F.3d at 440. Thus,

Defendant Clark's equal protection challenge fails.

**IV.    This Court Should Sentence Defendant Clark to the Low End of the Guidelines Range As Calculated Based on the Offense Level for Crack Cocaine.**

According to the initial Presentence Investigation Report ("PSR"), disclosed on January 26,

2006, Defendant Clark is responsible for a total of 21.2 grams of crack cocaine, which, taken

together with the 112.4 grams of marijuana for which he also is responsible, yields a base offense

level of 28. PSR ¶¶ 3,18. After adjustments for gun possession and acceptance of responsibility,

Defendant Clark's total offense level is 27. *Id.* ¶¶ 19, 25, 26. His Criminal History Category is I.

*Id.* ¶ 29. His Guidelines range therefore is 70 to 87 months. *Id.* ¶ 62. Other than the crack/powder

disparity, Defendant Clark does not identify any individualized factors in his case that would justify

---

[27]    Defendant Clark also includes in his equal protection argument approximately eight pages of remarks made by Members of Congress who supported adoption of the Commission's proposal. Mem. 20-28. The purpose of including those remarks is not entirely clear. Arguably, a few might be read to suggest an improper racial motive on the part of opponents of the equalization proposal. Even if that were a fair reading of some of the remarks, it proves nothing. Insinuations, or even explicit accusations, of racial bias by partisan opponents during an impassioned political debate are not "evidence" of an impermissible motivation on the part of Congress.

a sentence below the Guidelines range.[28] Defendant Clark should receive a sentence at the low end of this range.

Although Defendant Clark's offenses were serious, and posed a significant danger to the community, he promptly accepted responsibility for his actions, pleading guilty about four months after he was indicted, and telling the Presentence Investigation Report writer that he regretted his conduct. *Id.* ¶¶ 1-2, 13. Defendant Clark's criminal record is limited; his only prior conviction, for attempted distribution of cocaine and attempted possession with intent to distribute PCP, was in 1990, and he has not been arrested since 1997. *Id.* ¶¶ 28, 30-31. Defendant Clark was granted early termination of probation in his 1990 case. *Id.* ¶ 28. In addition, it appears that he has maintained a good relationship with his family, including caring for his sister until her death in 1999 and remaining close to his thirteen-year-old daughter. *Id.* ¶¶ 32, 36, 38. For all of these reasons, the Government believes that a sentence at the low end of the Guidelines range is appropriate.

---

28/    Defendant Clark does point out that he is not a "serious or high-level trafficker" and that he "did not engage in any violence, nor is it alleged that he possessed a gun in connection with possession with intent to distribute cocaine." Mem. 34. But the Guidelines range takes into account the quantity of cocaine for which Defendant Clark is responsible and any violence or firearms associated with the offense.

## CONCLUSION

WHEREFORE, the Government respectfully requests that the Court sentence Defendant Clark to the low end of the sentencing range as calculated based on the offense level for crack cocaine.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney

_____
JESSIE K. LIU
Assistant United States Attorney
D.C. Bar No. 472845
555 Fourth Street, N.W., Room 4649
Washington, D.C. 20530
(202) 514-7549

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a copy of the foregoing via United States mail, postage prepaid, to counsel for Defendant:

Nikki U. Lotze, Esquire
Roberts & Wood
6801 Kenilworth Avenue
Berkshire Building, Suite 202
Riverdale, Maryland 20737

this thirtieth day of January, 2006.

_____
JESSIE K. LIU
Assistant United States Attorney